

IN THE

# Court of Appeals of Indiana

Bradley W. Hobbs,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 30 2026, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 30, 2026

Court of Appeals Case No.
25A-CR-2343

Appeal from the Decatur Superior Court

The Honorable Matthew D. Bailey, Judge

Trial Court Cause No.
16D01-2308-F6-854

**Opinion by Judge DeBoer**
Judges Altice and Kenworthy concur.

**DeBoer, Judge.**

## Case Summary[1]

[1] In August 2023, Bradley Hobbs and his then-girlfriend, Aubree Whitham,[2] were in a single motorcycle accident. One of their cellphones detected they had been in an accident and made an automated 911 call to inform authorities there may have been an accident and its location. Aubree was injured and unresponsive. While their friends on another motorcycle quickly came to her assistance, Hobbs left the scene before authorities or medical personnel arrived. A few days later, he told the police "[he] took off . . . because [his friends] told [him] that [he] killed [Aubree]." State's Exhibit 3 at 00:13-00:15. The next day, he was charged with Level 6 felony leaving the scene of an accident. The charges were later amended to add a habitual offender enhancement.

[2] At trial, the State presented evidence that Hobbs left the scene without (1) providing Aubree with his name, address, registration, and driver's license, (2) reasonably assisting Aubree, or (3) notifying authorities about the accident or ensuring another person had done so. *See* Ind. Code § 9-26-1-1.1(a)(2), (3). The jury was instructed that, to find Hobbs guilty, the State had to prove every

---

[1] We held a traveling oral argument in this case on April 9, 2026 at KIPP Indy Legacy High School. We thank counsel for their time and excellent advocacy. We also extend our gratitude to our hosts at KIPP Legacy for welcoming the Appeals on Wheels program for the first time, and to the sophomores and seniors for their attentive and thoughtful questions.

[2] Bradley and Aubree got married during these proceedings and thus, her current name is Aubree Hobbs. However, at the time of the accident, her name was Aubree Whitham. To avoid any confusion, we refer to her as "Aubree" throughout this opinion.

element above, among others, beyond a reasonable doubt. The jury found him guilty, and Hobbs subsequently admitted to being a habitual offender. Hobbs now appeals, arguing there was insufficient evidence to support his conviction for leaving the scene of the accident. We affirm.

## Facts and Procedural History

[3] In August 2023, Hobbs and Aubree had been together for over twenty years, and they shared a child and a grandchild. On the evening of the 27th, they were out riding Hobbs' motorcycle when they encountered their grandchild's other grandparents, Wade and Tanya Markland. The couples rode their motorcycles around southern Indiana for a while and eventually stopped for dinner. After they ate, they headed back to town toward the Marklands' apartment complex. On their way, there was an issue with the back tire of the motorcycle Hobbs and Aubree were riding—and they crashed. One of their phones detected that there may have been an accident and made an automated 911 call with the location (longitude and latitude) of the accident. *See* State's Ex. 1(B). Wade and Tanya, who were riding ahead on another bike, saw in their rearview mirror that Hobbs' bike had gone down and immediately turned around to help.

[4] Soon after the automated 911 call went through, Tanya called 911. *See* State's Ex. 1(A). The Marklands found Aubree face down and non-responsive in the grassy median. She was bleeding from her head and had a large bruise under her left arm. Wade cleared her airway of grass and dirt before performing CPR, and she quickly regained consciousness. While this was going on, Tanya

observed Hobbs stumble up to where they were helping Aubree, and she later described that "[h]e was just kind of walking around, not knowing what was going on." Transcript Vol. 2 at 227. He eventually "just walked off somewhere" and didn't respond when she called out to him. *Id.*

[5] Greensburg Police Officer Stephen Hershberger was dispatched to the motorcycle crash, and it only took him about a minute to reach the scene. When he arrived, Aubree was conscious and Hobbs was no longer present. Paramedics arrived and took over assisting Aubree, and Officer Hershberger gathered information about the accident from the individuals at the scene, including the Marklands and another witness. The other witness said he saw Hobbs attempt to use his motorcycle, but when it didn't start, he began walking away from the scene. He then saw another person on a moped pick up Hobbs and drive away. Later, the police and a few of Hobbs' friends searched the area for him but were unable to find him.

[6] The next day, Hobbs reached out to Aubree's brother, who was a State Trooper, to get information related to the accident, including whether there was a warrant out for his arrest. Aubree's brother eventually talked to Officer Hershberger, who told him to have Hobbs reach out to him. Hobbs contacted Officer Hershberger the following day and asked to speak to him, after which Officer Hershberger and another officer went to his house to talk to Hobbs. There, Hobbs told them "the reason [he] took off was because [the Marklands] told [him] that [he] killed" Aubree, and he had a lot going on personally at the time. State's Ex. 3 at 00:13-00:15. He added that he was insured and licensed

to drive a motorcycle, and he "didn't even know why [he] took off, honestly." *Id.* at 00:30-00:32. Hobbs said that after leaving the scene, all he remembered was waking up later that night in some bushes next to the nearby interstate and an apartment complex.

[7] The day after Hobbs spoke with Officer Hershberger, the State charged Hobbs with Level 6 felony leaving the scene of an accident. The next day, the State amended the charges to add a habitual offender sentence enhancement. At his trial in June 2025, Officer Hershberger, Wade, Tanya, Aubree, Hobbs' friend, Hobbs' brother-in-law, and two witnesses testified to the facts above. The evidence admitted at trial consisted of the automated 911 call, Tanya's 911 call, and Officer Hershberger's body camera footage from the scene of the accident and from his conversation with Hobbs at his house a couple days later. As of the date of the trial, the State had not yet determined whether it was Hobbs' or Aubree's phone that had made the automated 911 call, and Officer Hershberger testified he had not investigated that issue.

[8] Aubree testified that she fractured her neck during the accident and had to wear a neck brace for a few months, but she did not have any lasting effects from the accident or her injuries. Tanya testified that she never told Hobbs he had killed Aubree, and even though she was initially concerned that Aubree might have been dead when they found her, she "would not say that out loud." Tr. Vol. 2 at 229. The witness who saw Hobbs leave the scene on a moped testified similarly to what he'd told Officer Hershberger at the scene. However, he confirmed on cross-examination that he also told Officer Hershberger that he

"didn't get a very good look at" the man who got on the moped. Tr. Vol 3 at 13. Officer Hershberger never questioned the other witness who arrived at the scene before law enforcement and medical personnel. But at trial, she testified that she "did not see a moped" at the scene. *Id.* at 17.

[9] After the close of evidence, the trial court instructed the jury about the elements of the offense. The instruction specifically provided:

> Before you may convict the Defendant, the State must have proved *each* of the following beyond a reasonable doubt:
>
> 1. The Defendant
> 2. Was the operator of a vehicle involved in the accident;
> 3. The Defendant should have reasonably anticipated that the accident resulted in injury to a person;
> 4. And the Defendant knowingly or intentionally,
> 5. Did not remain at the scene of the accident until he had:
>     a. Given his name, address, and the registration number of the vehicle he had been driving to any person involved in the accident, and
>     b. Exhibited his driver's license to any person involved in the accident; and
> 6. Failed to provide reasonable assistance to each person injured in the accident, as directed by a law enforcement officer, medical personnel, or a 911 telephone operator; and
> 7. Failed to immediately give notice of the accident by the quickest means of communication to the local police department of the municipality in which the accident occurred; and
> 8. The accident involved moderate or serious bodily injury to Aubree Whitham.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of leaving the scene of an accident, a Level 6 felony.

Appellant's App. Vol 2 at 123-24 (Final Jury Instruction No. 2) (emphasis added). The jury found Hobbs guilty as charged. He then admitted to being a habitual offender.

[10] Almost two weeks after the trial and before Hobbs was sentenced, the State received notice that the automated 911 call had originated from Hobbs' cellphone. The State shared that information with Hobbs, who subsequently filed a motion to correct error and a request for a new trial based on newly discovered evidence. The State argued that this could not serve as a basis for a new trial because Hobbs did not do his due diligence to acquire the information before trial. It pointed out that Hobbs could have obtained the same information by requesting his own phone records from his provider. Hobbs argued that it was the State's obligation to provide this information, and the jury would have found the information more credible had it come from the 911 operator rather than Hobbs. Concluding that Hobbs did not exercise due diligence in obtaining this information from resources available to him, the court denied his motion to correct error.

[11] Hobbs was sentenced to two years on the leaving the scene offense and three years on the habitual offender enhancement, for an aggregate sentence of five years. Three years were to be executed in the Department of Correction and two years were suspended to probation. Hobbs now appeals his conviction.

## Discussion and Decision

[12] Hobbs contends there is insufficient evidence to support his conviction for leaving the scene of the accident. Our standard of review for sufficiency of the evidence is well established:

> [W]e look only at the probative evidence and reasonable inferences supporting the verdict. We do not assess the credibility of witnesses or reweigh the evidence. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Rakhimov v. State*, 260 N.E.3d 263, 266 (Ind. Ct. App. 2025) (quoting *Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017)), *trans. denied*. Hobbs' arguments also present issues of statutory interpretation, which we review de novo. *Coonce v. State*, 240 N.E.3d 721, 723 (Ind. Ct. App. 2024). Our "first step is to determine whether the Legislature has spoken clearly and unambiguously on the point in question." *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015). Unambiguous statutes are applied according to their plain and ordinary meaning. *Id.* If a statute is ambiguous, meaning it is "susceptible to more than one interpretation[,]" our goal is to determine and implement the Legislature's intent. *Id.* (quoting *City of N. Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1, 4 (Ind. 2005), *reh'g denied*). We will "not presume that the Legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result." *Id.* (quoting *Jennings*, 829 N.E.2d at 5).

When the operator of a motor vehicle is involved in an accident, Indiana Code section 9-26-1-1.1(a) requires that he, in pertinent part,

> (2) Remain[s] at the scene of the accident until the operator does the following:
>
> > (A) Gives the operator's name and address and the registration number of the motor vehicle the operator was driving to any person involved in the accident.
> >
> > (B) Exhibits the operator's driver's license to any person involved in the accident or occupant of or any person attending to any vehicle involved in the accident.
>
> (3) If the accident results in the injury or death of another person, the operator shall, in addition to the requirements [above]:
>
> > (A) provide reasonable assistance to each person injured in or entrapped by the accident, as directed by a law enforcement officer, medical personnel, or a 911 telephone operator; and
> >
> > (B) as soon as possible after the accident, immediately give notice of the accident, or ensure that another person gives notice of the accident, by the quickest means of communication to one . . . of the following:
> >
> > > (i) The local police department, if the accident occurs within a municipality.
> > >
> > > (ii) The office of the county sheriff or the nearest state police post, if the accident occurs outside a municipality.

(iii) A 911 telephone operator.

[14] If the operator knowingly or intentionally fails to comply with any these requirements, he commits Class B misdemeanor leaving the scene of an accident. I.C. § 9-26-1-1.1(b). The offense is a Level 6 felony if "the accident results in moderate or serious bodily injury to another person[.]" I.C. § 9-26-1-1.1(b)(2)(A). Hobbs specifically argues there was insufficient evidence that he failed to: (1) give Aubree his name, address, registration, and driver's license information; (2) provide Aubree with reasonable assistance; and (3) notify authorities about the accident.

[15] The parties dispute whether we must find there was sufficient evidence to show Hobbs failed to comply with only *one* of these statutory duties or *all* of them. The statute is written in the disjunctive, meaning proof of a person's intentional or knowing failure to take *any one* of the actions required under the statute would support a conviction for leaving the scene of an accident. *See Nield v. State*, 677 N.E.2d 79, 81 (Ind. Ct. App. 1997) (noting as to a previous version of the statute that "[i]nasmuch as the elements are listed in the conjunctive, a person commits a criminal offense in failing to adhere to any one of the requirements"). However, the preliminary and final jury instructions—identical to those proposed by the State—unambiguously required the State to prove *each* element listed in the statute above beyond a reasonable doubt. *Compare* Appellant's App. Vol. 2 at 103-04 (Preliminary Instruction No. 2), 123-24 (Final Instruction No. 2) *with id.* at 61-62, 84-85 (State's proffered instructions). Hobbs contends his conviction must be overturned unless we find sufficient

evidence of every element. The State claims this Court is free to disregard the mistakenly heightened burden imposed at trial and should instead apply the statute as written. However, we need not resolve this question because sufficient evidence supports the judgment even under the heightened burden.

## 2. Identification Information

[16] Turning to the first element, the statute states:

> The operator of a motor vehicle involved in an accident *shall* . . . [r]emain at the scene *until* the operator . . . :
>
> (A) Gives [his] name and address and the registration number of the motor vehicle [he] was driving to *any person involved* in the accident.
>
> (B) Exhibit [his] driver's license to *any person involved* in the accident or occupant of *or any person attending to any vehicle* involved in the accident.

I.C. § 9-26-1-1.1(a)(2) (emphases added). Hobbs conceded at oral argument that the statute is unambiguous, and the undisputed facts show he was the operator of the vehicle and Aubree was "involved in the accident" as that phrase is used in each provision. *Id.* Thus, under the plain language of this provision, Hobbs was required to provide Aubree, or someone attending to her at the site of the accident, with his name, address, driver's license, and registration before leaving the scene.

Hobbs also admitted at oral argument that he left the scene without fulfilling any of these duties. He argues instead that he should be exempt from these requirements. Hobbs claims it would produce absurd results to interpret this provision to require "people in long[-]term relationships who are involved in a one-vehicle accident to tell each other their names, address, registration number[,] and to show each other their driver's licenses . . . ." Appellant's Reply Br. at 9. Hobbs is correct that we seek to avoid absurd or illogical interpretations of statutory language. *Anderson*, 42 N.E.3d at 85; *see also In re Guardianship of A.J.A.*, 991 N.E.2d 110, 113 (Ind. 2013) ("[C]ourts will reject an interpretation of a statute which produces an absurd result." (quoting *In re Visitation of J.P.H.*, 709 N.E.2d 44, 46 (Ind. Ct. App. 1999))). Indeed, "the absurdity doctrine [is] 'strong medicine' that 'defeats even the plain meaning of statutes.'" *R.R. v. State*, 106 N.E.3d 1037, 1042 (Ind. 2018) (quoting *Calvin v. State*, 87 N.E.3d 474, 477 (Ind. 2017)). However, we do not find that such doctrine defeats the plain meaning of the statute at issue here.

The absurdity doctrine only applies when the appellant has made a two-part showing. *Id.* "First, the text must impose an outcome no reasonable person could intend." *Id.* Second, we must be able to correct the absurdity "by 'changing or supplying a word or phrase whose inclusion or omission was obviously a technical or ministerial error.'" *Id.* (quoting ANTONIN SCALIA & BRYAN A. GARBER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 237-38 (2012)). A result that is "merely unwise or unsound" does not warrant judicial intervention—our role is "not rewriting substantive provisions because

the drafter failed to appreciate their intended effect." *Id.* Thus, overcoming the plain meaning on grounds of absurdity is "a very high bar[,]" and a feat Hobbs has not accomplished here. *Id.*

[19] Even if we were to assume that no reasonable person could intend for this statute to require a driver to share his identification information with his long-term significant other, "the judicial fix would not be modest." *Id.* Rather, this Court would be usurping the Legislature's prerogative by adding a substantive exception into a statute whose plain language contains none.

> Declaring a plain meaning absurd tells the legislature that it may not legislate in that way even if it uses the clearest terms; it invokes "the serious judicial act of declaring matters beyond the reach of the political branches." [John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2476 (2003)]. That is a bold declaration, even for a single unforeseen application at a statute's periphery.

*Calvin*, 87 N.E.3d at 478.

[20] Because the plain language of the statute requires Hobbs to give Aubree, or someone attending at the scene, his name, address, driver's license, and registration before leaving the scene and he admits that he failed to do any of those things, we find there was sufficient evidence to support such element.[3]

---

[3] Hobbs' policy concerns are better suited for the Legislature.

### 3. Reasonable Assistance

[21] Next, Hobbs argues there was insufficient evidence that he failed to provide Aubree with reasonable assistance before leaving the scene. The relevant portion of the statute provides,

> If the accident results in the injury or death of another person, the operator shall . . . provide reasonable assistance to each person injured in . . . the accident, as directed by a law enforcement officer, medical personnel, or a 911 telephone operator . . . .

I.C. § 9-26-1-1.1(a)(3)(A). There is no dispute that Aubree was injured in the accident. However, Hobbs claims he did not fail to reasonably assist her for two reasons: (1) he was never directed to provide her with assistance, and (2) the Marklands were already assisting her.

[22] Hobbs contends the phrase "as directed by" in this provision means the operator only has a duty to provide reasonable assistance upon being directed by authorities to provide such assistance. Thus, because Hobbs never personally called 911 and was never directed how to assist Aubree, he claims he was not in violation of the statute by leaving the scene without providing her any assistance. "We examine the statute as a whole, reading its sections together so that no part is rendered meaningless if it can be harmonized with the remainder of the statute." *Anderson*, 42 N.E.3d at 85. A harmonious reading of the statute reveals that the duties to notify authorities and render aid as directed work in tandem, as no direction can be given by authorities or paramedics until they have been contacted. Thus, we agree with the State that

Hobbs' failure to fulfill another one of his statutory duties, as we discuss below, cannot then justify his failure to assist Aubree.

[23] Hobbs' second claim is equally unpersuasive. He suggests that the assistance Aubree received from others absolved him of his own duty to assist her. An analysis of the reasonableness of any assistance provided may include a consideration of whether the victim was already being assisted. But here, Hobbs provided Aubree with *no* assistance whatsoever. Rather, he fled the scene while she was unresponsive on the side of the road. Moreover, the statute unequivocally mandates *the operator of the vehicle* to render reasonable assistance to those injured, with no exception or implication that such duty is lessened by the assistance provided by others. Hobbs offers no evidence or authority to indicate that such an exception was intended by or can be derived from a plain reading of the statute's text. In light of the evidence showing Hobbs fled the scene without providing Aubree any assistance at all, let alone reasonable assistance, we find there was sufficient evidence to support this element of the offense.

### 4. Notifying Authorities

[24] The last element challenged by Hobbs relates to notifying authorities about the accident. The relevant provision provides,

> If the accident results in the injury or death of another person, the operator shall, . . . as soon as possible after the accident, immediately give notice of the accident, or ensure that another person gives notice of the accident, by the quickest means of communication to one . . . of the following:

> (i) The local police department, if the accident occurs within a municipality.
>
> (ii) The office of the county sheriff or the nearest state police post, if the accident occurs outside a municipality.
>
> (iii) A 911 telephone operator.

I.C. § 9-26-1-1.1(a)(3)(B).

[25] Hobbs argues the State failed to prove beyond a reasonable doubt that he did not notify authorities of the accident because the "automated 911 call satisfie[d]" that statutory duty. Appellant's Reply Br. at 7. He contends that the only plausible interpretation of this provision would result in a conclusion that the automated 911 call fulfilled this requirement. Otherwise, it "would create the absurd result of penalizing a driver for using superior, faster safety technology to immediately give notice of an accident." *Id.* at 8.

[26] As discussed above, Hobbs concedes that the statute is unambiguous. Thus, we will interpret it according to its "plain and ordinary meaning." *Fix v. State*, 186 N.E.3d 1134, 1139 (Ind. 2022). This provision required Hobbs, *after* the accident had occurred, to "immediately give notice of the accident" to local authorities "or ensure that another person" did so. I.C. § 9-26-1-1.1(a)(3)(B) (emphasis added). The text clearly directs the operator to take either of two affirmative actions after the accident: (1) personally provide notice to authorities *or* (2) make sure someone else has. As to the first option, Hobbs did not personally notify authorities after the crash—he did not place the 911 call or

otherwise act to contact local authorities about the accident. His cellphone activated its crash detection feature and initiated the automated 911 call, but there is no evidence he even knew that his cellphone possessed that capability, let alone that the automated 911 call was made.

[27] Alternatively, Hobbs could have ensured that another person notified authorities about the accident. And he claims he did so "by carrying a cellular telephone with the automated emergency notification system." Appellant's Br. at 8. "Ensure" means "to make sure, certain, or safe[.]" *Ensure*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/ensure [https://perma.cc/3WJ6-CYRK]. Again, there is no evidence Hobbs knew his cellphone had this capability, chose to carry the cellphone because it had such capability, or otherwise specifically sought out or enabled the crash detection and alert feature. The statute is prospective (meaning it sets forth actions an operator must take after an accident), not retrospective (meaning an operator's duties cannot be satisfied by an automated call they had no actual knowledge of before they left the scene of an accident). Merely owning a cellphone with this feature does not reflect that, after the accident happened, Hobbs "ensured" someone notified authorities. And any argument that Tanya's 911 call fulfilled his duty to ensure that authorities were notified is equally unavailing. There is no evidence in the record that Hobbs directed Tanya to call 911 or otherwise confirmed that she did so. Thus, Tanya's 911 call did not satisfy Hobbs' statutory duty here.

[28]     Hobbs stresses that an automated 911 call is "the quickest means of communication." Appellant's Reply. Br. at 7.  He purports that a "driver, by possessing a cell phone or vehicle with the automated 911 feature enabled, satisfies the statute by immediately giving notice of the accident." *Id.* at 7-8 (internal quotations omitted).  He claims "the statute focuses on the *result* . . ., not the *method* . . . ." *Id.* at 8.  But these assertions miss the mark, as Hobbs disregards that the statute mandates *who* must act under the statute, namely "*the operator.*"  I.C. § 9-26-1-1.1(a)(3)  (emphasis added).  Clearly, the word "operator" refers to a person—the person driving the vehicle.  And it is that person who is obligated to take some affirmative action to either personally notify authorities of the accident or ensure another person did so.  Thus, it is not necessarily the method by which authorities were notified here that runs afoul of the statute—indeed, it explicitly contemplates notification by calling 911—but rather, *who* did, or in this case did not, provide that notification. Hobbs' phone took action, but he himself did nothing after the accident occurred to make sure authorities were notified.  Under these circumstances the automated 911 call did not satisfy Hobbs' duty to notify authorities about the accident or ensure that another person did so.

[29]     Finally, with that conclusion in mind, we consider whether there was sufficient evidence to prove that Hobbs failed to notify authorities before leaving the scene of the accident. The record shows Hobbs fled the scene within a few minutes of the crash because he thought he'd killed Aubree and had been going through a lot in his personal life at the time.  *See* State's Ex. 3 at 00:14-00:25.

He did not contact the police until a few days later and purportedly only did so to get the hold on his motorcycle released.[4] There was evidence presented that an automated 911 call had been placed, but law enforcement did not know whether Hobbs' or Aubrey's phone had made the call. And though the parties agreed that on balance, there was an equal chance it came from either phone, there was no evidence that Hobbs knew the automated 911 call had been placed or that he was otherwise involved in placing it. In sum, he did *nothing* to comply with his statutory duties before he fled the scene. Thus, despite his assertions otherwise, it was immaterial that there was an equal chance the automated 911 call came from Hobbs' phone because the automated 911 call, in and of itself, did not satisfy his statutory duty to notify authorities. In light of these facts, we find there was sufficient evidence to prove he failed to notify authorities before leaving the scene of the accident.

## Conclusion

Finding there was sufficient evidence to support Hobbs' conviction, we affirm.

Affirmed.

Altice, J., and Kenworthy, J., concur.

---

[4] *See* Tr. Vol. 2 at 152 (Hobbs' counsel explaining that "[he] and his friends, very clearly, . . . all believed that the issue was talking to a police officer. He had to go and talk to a police officer to have that bike released.").

ATTORNEY FOR APPELLANT

Amanda O. Blackketter
Blackketter Law LLC
Shelbyville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Jennifer Anwarzai
Grace C. Slaney
Deputy Attorneys General
Indianapolis, Indiana